IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JOHN CLARK,                                    )
                                               )
            Plaintiff,                         )
                                               )        CIVIL ACTION NO. 00-JEO-2763-S
v.                                             )
                                               )
THE BOARD OF TRUSTEES OF                       )
THE UNIVERSITY OF ALABAMA                      )
IN BIRMINGHAM,                                 )
                                               )
            Defendant.                         )

## MEMORANDUM OPINION

In this action, plaintiff John Clark (hereinafter "Clark" or "the plaintiff"), a former

employee of the defendant, the Board of Trustees of the University of Alabama at Birmingham

(hereinafter "the University" or "the defendant"), asserts various claims of race discrimination

against the defendant, purportedly in violation of Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e, *et seq.*, the Civil Rights Act of 1991, 42 U.S.C. § 1981, and 42 U.S.C. § 1983.

Presently before the court is the defendant's motion for summary judgment as to all of the claims

(doc. 17),[1] the plaintiff's motion to strike certain of the defendant's evidence (doc. 24), and the

defendant's motion to strike or, in the alternative, to dismiss the plaintiff's procedural due

process claim (doc. 26).  Upon due consideration, the court finds that the motion to strike is due

to be denied, that the motion for summary judgment is due to be granted, and that the motion to

strike is moot.

---

[1] References to "Doc. ___" are to the documents as numbered by the Clerk of the Court in the court's record of the
case.

## PROCEDURAL BACKGROUND

When the plaintiff initially filed his complaint, he alleged various claims of race discrimination. Specifically, in Count I he alleged disparate treatment with regard to his employment conditions, transfers, and his termination; in Count II he alleged discrimination with regard to his termination; in Count III he alleged that his termination was in retaliation for his participation in a previous lawsuit and for filing other grievances; in Count IV he alleged a disparate treatment in discipline, transfers and termination claim pursuant to § 1981; in Count V he alleged that his termination was a result of his race in violation of § 1981; in Count VI he alleged a retaliation claim pursuant to § 1981; and, in Count VII he alleged he was denied due process with regard to his termination hearing in violation of § 1983. (Doc. 1). The defendant filed the present motion for summary judgment as to all the plaintiff's claims. (Doc. 17). The plaintiff has filed a motion to strike certain portions of the defendant's evidence. (Doc. 24). The defendant has also filed a motion to strike, or in the alternative to dismiss the plaintiff's claim of a violation of his due process rights. (Doc. 26).

## FACTUAL SUMMARY[2]

The University hired Clark on August 12, 1985, to work in its campus maintenance department as a maintenance mechanic. (Deposition of John Clark (hereinafter "Clark Dep.") at 19).[3] In 1990, Clark became an HVAC mechanic as a result of a consent decree entered in another lawsuit involving the defendant. (*Perry Woods v. Board of Trustees of the University of*

---

[2] The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff. They are the "'facts' for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)." *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[3] Clark's deposition can be found at document 17, exhibit A and at document 25, exhibit 1.

2

*Alabama*, CV 87-C-2182-S).[4]  (Clark Dep. at 19).  Many other employees were upset over the

fact that the promotions were precipitated by the lawsuit.  (Armstrong Dep. at 26-29).

### Central Utility

When Clark was promoted to the HVAC mechanic's position, he was moved to the

Central Utility Department.  (Clark Dep. at 20).  He was there for approximately 18 months, until

around 1992.  (*Id.*).  While in Central Utility, the plaintiff was harassed by Roger Quick, a

supervisor, and by Sam Moseley, a co-worker.  (Clark Dep. at 27-30).  For example, Quick

would call the plaintiff "boy" and would "talk down to" him.  (*Id.* at 28).  Quick also tended to

believe the negative comments other employees told him about the plaintiff.  (*Id.* at 28-29).

Moseley would address the plaintiff using the word "nigger."  (*Id.* at 31).  Additionally, the

plaintiff had a repairman, Keith Gant, working under him that Moseley directed to do the

opposite of what the plaintiff had instructed him to do.  (*Id.* at 29).

The plaintiff complained about Moseley harassing him to management and his attorney in

the *Woods* litigation.  (*Id.* at 29-31).  The plaintiff's attorney sent a letter about the harassing

---

[4] The *Woods* litigation involved allegations that black employees in the University's Facilities Management Department (hereinafter the "FMD") had been discriminated against on the basis of race in promotions, work assignments, and other terms and conditions of employment.  (Ina Leonard Aff. (hereinafter "Leonard Aff." which is located at document 18, exhibit J)).  The case resulted in a settlement that included a consent decree that was to last three years.  Before the decree was satisfied, the court entered an order providing for a grievance review procedure to address complaints of employees who believed that the decree was not being followed.

The procedure provided that the complaining employee could file a grievance with the FMD.  A copy of the grievance was also provided to the attorneys representing the class members.  The employee and the FMD were given an opportunity to resolve the issue.  If that step was unsuccessful, the employee could file a formal grievance with the trial judge under the Consent Decree.

The defendant moved to terminate the Consent Decree on December 5, 1994.  At that time only seven employee grievances were pending.  The plaintiff did not have a grievance pending at that point.

The court scheduled the matter for a hearing on May 12, 1995.  At the hearing, the court stated that it believed that the provisions of the Consent Decree had been complied with and that the Decree was due to be dismissed except for the pending grievances.  The decree was ultimately dismissed on November 18, 1999, after the seven grievances had been resolved.  (Clark Dep. at 48).

conduct to Brooks Baker, the Vice President for the Facilities Management Department. (*Id.* at 30; Armstrong Dep. at 16). The harassment continued after the letter was sent and the plaintiff again complained directly to Baker. (*Id.* at 31). As a consequence of his complaints, the plaintiff was transferred at his request from Central Utility to the University's Dental School. (*Id.* at 31-32).

### Dental School

When the plaintiff transferred to the Dental School, the harassment continued. (Clark Dep. at 38). Jerry Chafin, a maintenance supervisor in the Dental School, never accepted him because he received the job as a consequence of the *Woods* litigation. (*Id.* at 32-33). The plaintiff stated that Chafin "had [a] bitter taste in his mouth because of the court case." (*Id.* at 33). Chafin also called him "brother" all the time. (*Id.* at 33). The plaintiff equated this to being called "boy." (*Id.*). Chafin was critical of the plaintiff's work product. (*Id.*). He would let other employees treat Clark poorly. (*Id.* at 34). Chafin also would call the plaintiff into his office whenever one of the other white employees (including Jimmy Smith and Gordon Apperson) told him that Clark had done something wrong. (*Id.* at 34). Another complaint voiced by the plaintiff during his deposition concerned an incident involving Smith saying something about "blacks being monkeys." (*Id.*). Chafin heard them discussing the situation and took the plaintiff to his office to talk with him. As a consequence of the incident, the plaintiff received a warning. (*Id.* at 34-35). No action was taken against Smith.

Clark complained to Baker and his (Clark's) attorney about Quick, Chafin, and Smith. Clark thinks that a compromise was reached about the behavior of these individuals. (*Id.* at 40-41). No EEOC complaints were filed. (*Id.* at 36). Quick stopped making the comments after

4

this. (*Id*. at 42-43).

About this time, the plaintiff was offered a transfer out of the Dental School. (Clark Dep. at 43-44). He was told that it could result in his getting more training. (*Id*. at 44). The plaintiff stated that he felt that he could learn just as much in the Dental School, and he decided not to transfer. (*Id*.). He felt the offer of a transfer was Baker's idea and was a result of the problems with Chafin and Apperson. (*Id*. at 45).

### The *Woods* Grievance Procedure and Clark's Involvement

As noted above, the Woods' litigation resulted in, among other things, a grievance procedure whereby employees of the defendant could challenge the defendant's conduct when they believed it violated the Consent Decree. Clark initially filed several grievances using the process created by the *Woods* litigation.[5] (Clark Dep. at 30, 31, 114, 146-47, 155). In 1992, Franklin Littlejohn filed a petition with the court regarding the *Woods* matter. In 1993, under the *Woods* litigation, Clark filed a second petition against the University as a result of the continuing harassment. (Clark Dep. at 38-39; Littlejohn Dep. at 15).[6] The plaintiff's name was on this petition and the subsequent petitions filed by Littlejohn. (*Id*. at 12-13, 22). In 1994, as a result of the various complaints, the court established grievance procedures for the claimant class. (*Id*. at 16). Clark took an active role in other petitions that were filed as well, including research and representing a number of people in their race discrimination grievances, particularly the one involving Littlejohn. (*Id*. at 22). He represented Danny Steele in 1993-94, Derrick Brown in 1993, Alfonzo Cotton in 1994, and Johnny Armstrong in 1994 and 1995. (Doc. 25, Ex. 18 (John

---

[5] He was also involved with "round table" discussions with Baker concerning various complaints. (Clark Dep. at 36-41).

[6] Littlejohn's deposition is located at document 17, exhibit I.

Clark Affidavit (hereinafter Clark Aff.)) at ¶¶ 15-18).

Clark continued to represent employees of UAB when they filed grievances within the

UAB system. (Clark Affidavit at ¶ 19). The plaintiff "was always in the limelight of

representing any maintenance employee against the University all the way up to '98." (Clark

Dep. at 114). In 1995, Clark represented Laura Oliver when she filed a grievance regarding her

termination. (*Id*. at 20). He also represented Franklin Littlejohn in a 1997 grievance regarding a

written warning from Littlejohn's supervisor and his complaints of harassment, retaliation, dual

standards, and disparate impact on black employees. (Clark Dep. at 138; Littlejohn at 46).

Finally, he represented Derrick Brown in 1998 regarding a grievance he filed over Brown being

placed on probation for eighteen months under the three-strikes rule.[7] (Clark Dep. at 139-40).

### Other Problems

Clark had additional problems with Apperson in 1996. (Clark Dep. at 130). For

example, Apperson accused Clark of stealing and said that "all blacks steal." (*Id*. at 130).

Apperson stole freon from Clark's area in 1997. (*Id*. at 127). When Clark reported the stolen

freon to his supervisor, Fred Chambers, he did not investigate the event or discipline Apperson in

connection with the same. (*Id*. at 128-29). This was inconsistent with an event in 1996 when

another co-worker, Don Green, accused Clark of stealing freon. An investigation was conducted.

(*Id*. at 129). Clark, however, was not disciplined after the investigation because he explained

what happened to the freon. (*Id*. at 129-30). The plaintiff felt that Green was harassing him. (*Id*.

at 130). He also noted that Apperson and other employees called him (Clark) names after the

---

[7] The "three-strikes" rule provides that anyone who receives three disciplinary warnings within an eighteen month period may be terminated without the benefit of the usual disciplinary rights. (UAB Personnel Policies and Procedures Discipline Policy at 46 (found at doc. 25, ex. 16)).

incident.[8]  (*Id.*).

The altercations between Clark and Apperson continued until 1998.[9]  (*Id.* at 131).  At that

time, Baker told Clark "who would you think, if you can't get along with Mr. Apperson – who do

you think that I would remove out of the area first?  You or Apperson?"  (*Id.* at 132).  Baker then

answered his own question by stating that Clark would be moved first.  (*Id.*)

Several other disturbing examples of racism reportedly occurred during the early 1990s.

(Littlejohn Dep. at 25-26).  For example, a hangman's noose was displayed in Volker Hall.  (*Id.*

at 25-26, 31).  On other occasions during the first half of the 1990s, employees used other

racially derogatory terms.  (*Id.* at 31).

Clark's working areas oftentimes included the worst buildings and the worst areas.

(Armstrong Dep. at 46).  Clark also had the worst equipment.  (*Id.*).  According to Armstrong, "it

seem[ed] like they [were] doing everything they could to make him [(Clark)] fail at his position

or trying to force him either looking bad or not being able to perform his job where they could

get rid of him."  (*Id.* at 46-47).

### The Defendant's Zero Tolerance Policy

In or about 1995, when Susan McWilliams, the Associate Vice President for Human

Resource Management, came to work for the defendant, she made several changes in the

defendant's policies.  One of those changes concerned violence in the workplace.  (Deposition of

---

[8] The plaintiff did not specify in his deposition what names were used at this time.  (Clark Dep. at 130).

[9] The plaintiff was also aware of a situation in June 1997 between Apperson and Earnest Bloomer, another black employee, during which Apperson stated that he would take up a collection and buy Bloomer a ticket back to Africa.  (Apperson File Excerpts (Doc. 25, Ex. 9)).  As best this court can discern, no disciplinary action was taken against Apperson concerning this event.  Pruitt conducted the investigation in that matter.  (*Id.*).

Connie Pruett (hereinafter Pruett Dep.) at 11).[10]  Her new policy provided that there would be

zero tolerance of acts of violence in the workplace.  (*Id*. at 11-13).  Connie Pruett, the Director of

Human Resource Relations at UAB, described the new policy as follows:

> . . . . Obviously physical altercations we have zero tolerance for.
>
> Threats that you may have heard in the past and maybe overlooked, such as, "I'll do a postal on this place," or things like that, we take very seriously now. So there is zero tolerance for any of that kind of behavior.
>
> Somebody may come back and say:  I was kidding.  We don't know if you are or not.  So there was a very strong tightening of our reaction to any kind of threats or violence in the workplace.

(Pruett Dep. at 13).  Although there is some discretion in the three strikes policy, this discretion

is not present in the workplace violence policy.  (*Id*. at 11-13, 18).  The policy did not include

any discussion of self-defense.  (*Id*. at 16).

### The Alexander/Clark Altercation

On July 27, 1999, Clark was injured when he was assaulted by Lee Alexander, a black

co-worker.  (Clark Dep. at 50-51).  Clark and several other co-workers were waiting to "clock in"

when Alexander entered the room.  (*Id*. at 51-61).  Alexander, who had a large cup of coffee in

his hand, entered the room rudely and walked to the front of the line.  (*Id*. at 63).  Clark stepped

to the side and asked Alexander what was wrong with him.  (*Id*. at 64-65).  Alexander told Clark

"to shut [his] damn mouth."  (*Id*. at 65).  Alexander, then, punched Clark in the chest with his

finger.  (*Id*. at 67).  Clark stepped back a little bit, because he was thinking about his job.  (*Id*. at

77).  He knew that fighting on UAB property would result in termination.  (*Id*. at 112).  Clark

noticed that the coffee cup in Alexander's hand was full of coffee.  (*Id*. at 67).  Alexander "got

---

[10] Pruett's deposition can be found at document 17, exhibit F and at document 25, exhibit 3.

8

ready to throw the coffee on" Clark. (*Id*. at 67). Clark tried to defend himself and to block Alexander's blow by moving his arm up. (*Id*. at 67-68). Alexander hit Clark's head with the coffee cup, and Clark fell to the ground. (*Id*. at 68). Alexander then punched Clark several times. (*Id*. at 68). Some other people in the room pulled Alexander off of Clark. (*Id*. at 68). Clark states that he never hit Alexander. (*Id*. at 72). Clark was taken to the emergency room because of a cut on his head. (*Id*. at 73).

Cowan, the maintenance supervisor, reported the incident to William Odom, the Director of Campus Maintenance. (Deposition of William Odom (hereinafter "Odom Dep.") at 18-19).[11] Odom directed Cowan to get statements from all of the witnesses, Clark, and Alexander. (Odom Dep. at 29). The witnesses included Kelvin James, Matthew Coleman, Donnie Calvert, and Richard Crow. (Clark Dep. at 51-52). Mike Sargent, Jimmy Smith, and Richard Price, also witnessed at least some of the fight. (Deposition of Kelvin James (hereinafter "James Dep.") at 24).[12] According to James, he, Smith and Sargent "broke the fight [between Clark and Alexander] up." (*Id*.). Cowan reported to Odom that Clark had told the emergency personnel that he had hurt his head on a pipe.[13] (Odom Dep. at 30-31). Clark does not remember informing the nurse that he hit his head on a pipe or telling Cowan that he had informed the nurse that he had.[14] (Clark Dep. at 101). The plaintiff reported the incident to the UAB police while in the emergency room. (*Id*. at 103). As a result of the statements given by various witnesses,

---

[11] Odom's deposition can be found at document 17, exhibit G and at document 25, exhibit 2.

[12] James' deposition can be found at document 17, exhibit C and at document 25, exhibit 7.

[13] Cowan was unaware of the plaintiff's mental awareness of his circumstances while at the emergency room. (Odom Dep. at 31). According to Armstrong, the plaintiff was incoherent and looked traumatized while he was at the emergency room. (Armstrong Dep. at 60).

[14] He testified that the doctor suggested at one point that he looked like he hit his "head on a pipe or something." (Clark Dep. at 101). The plaintiff stated that he responded, "No, I got struck by an employee." (*Id*.).

Odom concluded that Clark verbally aggravated Alexander, but that Alexander instigated the physical contact, "then the ensuing fight broke out, with injuries resulting." (Odom Dep. at 34).

Anita Bonesera, an employee in the Human Relations Department, investigated the incident further. (Pruett Dep. at 14-15). She was provided with the written statements that had already been collected, and she talked with additional individuals. (Id.). Bonesera ultimately recommended to Pruett that Clark and Alexander be terminated due to the fact that the altercation involved physical contact. (Id. at 7, 15). On August 27, 1999, Clark received a letter informing him that he had been terminated effective August 17, 1999. (Complaint at ¶ 60).

On August 30, 1999, Clark filed a grievance regarding his termination. (Clark Dep. at 147). Under the UAB grievance policy, Clark could choose a representative to serve on the three person appeal panel. (UAB's Grievance Procedure for Nonfaculty Employees at 50).[15] The department, also, selected a panel member. (Id.). The third member was to be selected by the other two members. (Id.).

Clark first asked Marian Oree[16] to be his representative at the grievance hearing; however, Oree did not have to time to participate because he worked a different shift. (Clark Dep. at 148-49). Clark's next selection was Lloyd Dickey, however, according to Clark, Dickey was informed that he could not represent Clark because he was biased and because he was a co-worker. (Id. at 150; See also Deposition of Lloyd Dickey at 20).[17]

_____

[15] The policy is located at document 25, exhibit 17.

[16] Oree's name is also spelled Marron Orey elsewhere. (See Pruett Dep. at 23).

[17] Lloyd Dickey's deposition can be found at document 17, exhibit E and at document 25, exhibit 8. He stated that he "possibly" could have said that he was "too biased to sit on the committee." (Dickey Dep. at 20). At a later point in the deposition, he stated that he did not think he was "too biased to be on the committee because of the knowledge [he] had about the two people involved [or] that [he] felt uncomfortable with that." (Id. at 33). A letter from Senior HRM Relations Representative Chris R. Rossi on October 13, 1999, to the plaintiff states that Mr. Lloyd Dickey was not eligible to serve premised on the fact that he had "too much personal knowledge of [the plaintiff] and [Alexander]." (Clark Dep. at Ex. 12). This letter is consistent

Clark sent a letter to Rossi requesting "that HR find me a qualified representative to represent me since everyone I find is not qualified or eligible to represent me on the grievance in which I filed." (Clark Dep. at 151 & Ex. 13). In the letter, the plaintiff noted that Dickey was still willing to represent him in the disciplinary. (Clark Dep. at Ex. 13). The letter also referenced a prior phone conversation between the plaintiff and Rossi wherein Rossi told him that he needed to "find someone not apart (sic) of Facility Management."[18] (*Id.*). UAB asked two individuals to represent Clark, but both eventually declined. (Pruett Dep. at 26-27). The HRM department then picked someone to represent him.[19] (*Id.* at 152).

HRM set December 6, 1999, as the hearing date. (Clark Dep. at 153 & Ex. 15).[20] Pruett talked with someone in Clark's counsel's office about moving the matter forward to a conclusion.[21] Shortly thereafter, Pruett received a letter dated December 7, 1999, from the plaintiff's counsel, demanding that Dickey be allowed to be Clark's representative. (Pruett Dep. at 28 & Clark Dep. at Ex. 14). Clark's counsel also stated that he would not attend the hearing "until the issue of his rights to select a representative to serve on the Grievance Panel [was] resolved." (Clark Dep. at 154 & Ex. 14).

Pruett next advised her supervisor, Susan McWilliams, the Associate Vice President for

---

with the testimony of Pruett that she spoke with Dickey and he told her that he was a member of the facilities division, he knew both parties personally, and he could not be impartial in the process. (Pruett Dep. at 23-24). Pruett also told Dickey to let Clark know that he needed to select another person. (*Id.*).

[18] This request appears to be consistent with UAB's policy that an individual cannot be represented by another employee that works for the same supervisor. (Pruett Dep. at 20).

[19] According to Pruett, Clark selected Littlejohn as his representative. However, he decided not to participate. (Pruett Dep. at 25).

[20] The plaintiff's deposition identifies the date as December 6, 1999, while the letter from HRM lists the date as December 8, 1999. The difference is not significant under the circumstances.

[21] Pruett identified this person only as "Liz." (Pruett Dep. at 27).

11

Human Resource Management, that the grievance should be closed administratively because she felt that "it had reached a point of being unreasonable." (Pruett Dep. at 28). McWilliams agreed with Pruett, and the grievance was closed after consultation with legal counsel. (*Id.* at 28).[22]

On November 22, 1999, Clark filed a charge with the EEOC alleging that he had "been discriminated against because of [his] race in violation of Title VII of the Civil Rights Act of 1964, as amended, with respect to promotions, discipline, discharge and the terms and conditions of my employment. In addition, [he stated that he had] been the subject of retaliation for filing an earlier lawsuit against UAB and for Filing previous grievances." (Doc. 25, Ex. 13). On July 11, 2000, he received a "Right to Sue" letter form the EEOC.

### Comparator Evidence

The plaintiff asserts that there are two prior incidents involving other employees that constitute comparator situations. The first, which occurred on October 22, 1993, involves David Templin and Scott McCain. (Doc. 25, Ex. 11). Both employees are white. (Odom Dep. at 46). Templin accused McCain of punching and chocking him after McCain observed him touching his lunch box. (McCain Personnel File Excerpts at UAB01203).[23] The supervisor interviewed McCain who admitted that he pushed Templin. (*Id.*). McCain was not terminated. Instead, he was given a written warning that provided that he be given five days off work without pay. (*Id.* at UAB01235). It also stated that he could be terminated immediately if there was a reoccurrence. (*Id.*). Templin was also disciplined and lost three days work without pay.

---

[22] In her deposition, Pruett states that there was a hearing wherein the three person committee that was designated recommended that the plaintiff be reinstated. (Pruett at 29). McWilliams reviewed the decision and overruled the same, and upheld the termination premised on a policy of "zero tolerance." (*Id.* at 30).

[23] The file excerpts are located at document 25, exhibit 11.

(Templin Personnel File Excerpts at UAB01416).[24]

The second incident occurred on June 9, 1995, and involved Chris Catalano and Wayne Brown. In this incident, Brown was struck in the back of the head by a filter which was thrown by Catalano when he got mad. (Catalano Personnel File Excerpts at UAB01608).[25] Prior to the incident, Brown told Catalano that he was going to hurt someone if he did not calm down. (*Id.* at UAB01635). A short time later, Brown was hit by the filter after Catalano lost his temper. (*Id.* at UAB01608). Brown attributed the incident, which he deemed an accident, to Catalano's failure to control his temper. (*Id.*). Eugene Samules, another HVAC mechanic, who witnessed the incident stated that Catalano lost his temper when he banged his head on an overhead pipe. (Larry Eugene Samules Dep. (hereinafter "Samules Dep.") at 11).[26] Catalano was disciplined by losing work days without pay. (Odom Dep. at 47).

As a result of the verbal conflict between Apperson and Bloomer, where Apperson offered to buy Bloomer a ticket to Africa, Apperson was given a written warning and required to attend classes for dealing with difficult people. (Odom Dep. at 4).

In another incident, Samules, who worked in the "Townhouse building," heard a white employee, Mike Sargent, who was looking at a hunting book with photographs with rifles, say that he "would like to kill all the blacks" with a gun like that. (Samules Dep. at 9, 15). This incident occurred around 1997 or 1998. (*Id.*). Samules believed that Sargent was disciplined for this comment by losing two or three weeks pay.[27] (*Id.*).

---

[24] The file excerpts are located at document 25, exhibit 10.

[25] The file excerpts are located at document 25, exhibit 12.

[26] Samules' deposition is located at document 25, exhibit 6.

[27] The plaintiff asserts in his brief that Samules reported the incident. (Doc. 25, Brief at 16). A close examination of Samules' deposition does not support this statement in the brief. The deposition cite shows that Samules was upset by the comment and that Sargent was disciplined. (Samules Dep. at 15). It does not state that Samules reported the incident himself, to

## MOTION TO STRIKE LEONARD'S AFFIDAVIT
## AND THE EXHIBITS THERETO

The plaintiff asks the court to strike the affidavit of Ina Leonard and the exhibits thereto

because UAB failed to designate Leonard as the 30(b)(6) representative (*see* FED. R. CIV. P.

30(b)(6)), and, thereby denied the plaintiff the opportunity to cross-examine Leonard.  The

plaintiff contends that the court should strike the affidavit in accordance with Rule 37(c)(1) of

the FEDERAL RULES OF CIVIL PROCEDURE.  Rule 37(c)(1) states, in pertinent part,

> A party that without substantial justification fails to disclose information required
> by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by
> Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence
> at a trial, at a hearing, or on a motion any witness or information not so disclosed.

FED. R. CIV. P. 37(c)(1).

The defendant's initial disclosures (doc. 28 at ex. 1) state that the defendant agreed to

make the "Consent decree in the *Perry Woods v. Board of Trustees* case, and other attendant

documents from that case relative to the plaintiff" available to the plaintiff.  (*Id.*).  The consent

decree is attached to Leonard's affidavit as Exhibit A.  The other attached exhibits were also part

of the court record regarding the consent decree.  Therefore, the defendant did make these

materials available to the plaintiff.

While the defendant failed to include Leonard's name and address in the list of initial

disclosures, this failure was harmless.  Leonard's affidavit in this case merely provides the court

with additional background information regarding the *Perry Woods* litigation.  It puts the

plaintiff's claims in context.  However, since *Perry Woods* was a separate case, the consent

decree and history have no impact on the case before the bar other than in consideration of the

plaintiff's claim that UAB terminated him in retaliation for his involvement in the *Perry Woods*

---

whom it was reported, and who was involved in the discipline decision.  (*Id*. at 15-16).

litigation. Therefore, the plaintiff's motion to strike the affidavit and attached exhibits is due to be denied.

## SUMMARY JUDGMENT STANDARD

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex,* 477 U.S. at 322-23; *See* FED. R. CIV. P. 56(a) and (b). Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial,'" *Celotex*, 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id.*

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

15

FED. R. CIV. P. 56(c).  Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Celotex,* 477 U.S. at 322.

The substantive law will identify which facts are material and which are irrelevant.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson,* 477 U.S. at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson,* 477 U.S. at 249.  A judge's guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson,* 477 U.S. at 259; *See Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 745 n.11, 103 S. Ct. 2161, 76 L. Ed. 2d 277 (1983).  *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 643 (11th Cir. 1997).  However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matusushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *Anderson,* 477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman,* 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.  *Anderson,* 477 U.S. at 254; *Cottle v. Storer Communication, Inc.,* 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the

16

function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Allen*, 121 F.3d at 643.

**DISCUSSION**

**Disparate Treatment and Wrongful Termination Claims**

**Generally: *McDonnell Douglas* Analysis**

The Supreme Court's disparate treatment cases, such as *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981), provide the appropriate starting point for evaluating the plaintiff's Title VII claims. The *McDonnell Douglas* scheme for the allocation of burdens and the order of presentation of proof also applies in employment cases under § 1981 (42 U.S.C. § 1981). *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1060 (11th Cir. 1994). Under the applicable standard in a case like this, where the claims are premised upon circumstantial evidence of discrimination, the plaintiff has the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802; *Burdine*, 450 U.S. at 253-54 & n.6; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997), *cert. denied*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998).

To establish a prima facie case under *McDonnell Douglas*, the plaintiff generally needs to demonstrate: "(1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably;

and (4) he was qualified to do the job." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

For a court to determine that the plaintiff and the other employees are similarly situated it must

"consider whether the employees are involved in or accused of the same or similar conduct and

are disciplined in different ways." *Holifield*, 115 F.3d at 1562. Important factors include "the

nature of the offenses committed and the nature of the punishments imposed." *Jones*, 137 F.3d

at 1311 (citing *Jones v. Gerwens*, 874 F.2d 1534, 1539-40 (11th Cir. 1989)). If the plaintiff does

not "identify similarly situated, non-minority employees who were treated more favorably, [his]

case must fail because the burden is on [him] to establish [his] prima facie case." *Jones*, 137

F.3d 1306, 1311 (11th Cir. 1998) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824;

*Jones*, 874 F.2d 1541).

Once the plaintiff establishes a prima facie case, a legal presumption of unlawful

discrimination arises and the burden shifts to the defendant employer to articulate a legitimate,

nondiscriminatory reason for the challenged employment action. *McDonnell Douglas*, 411 U.S.

at 802; *Burdine*, 450 U.S. at 254; *Combs*, 106 F.3d at 1528. "To satisfy that burden of

production, '[t]he defendant need not persuade the court that it was actually motivated by the

proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to

whether it discriminated against the plaintiff.'" *Combs*, 106 F.3d at 1528 (quoting *Burdine*, 450

U.S. at 254-55).

Once the employer meets its burden of production, "[t]he presumption, having fulfilled its

role of forcing the defendant to come forward with some response, simply drops out of the

picture," *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 2749, 125 L.

Ed. 2d 407 (1993); *see also Burdine*, 450 U.S. at 255 & n.10, leaving the elements of the prima

facie case. *Combs*, 106 F.3d at 1528. When those elements are accompanied by evidence of

18

pretext or disbelief of the defendant's proffered explanation, they may permit, in some instances,

a finding for the plaintiff. *Id.* at 1529; *see also Hicks*, 509 U.S. at 511, *Evans*, 131 F.3d at 963.

The plaintiff, however, always retains the ultimate burden of proving that he was the victim of

intentional discrimination. *Hicks*, 509 U.S. at 508; *Burdine*, 450 U.S. at 253.

      The court's task in deciding the defendant's motion for summary judgment is limited.

The court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient

doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to

conclude that the employer's proffered 'legitimate reasons were not what actually motivated its

conduct. . . . The district court must evaluate whether the plaintiff has demonstrated 'such

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy

of credence.'" *Combs*, 106 F.3d at 1538 (citations omitted).

### Application of *McDonnell Douglas*

      The plaintiff's first general claim alleges that he suffered disparate treatment in that (1) he

was transferred to another area when he was the victim of racial slurs (complaint at ¶¶ 27-28);

and that (2) whites were treated better with respect to the terms of their employment (*id.* at ¶¶

37-48). He further alleges that the defendant terminated him because of his race. (*Id.* at ¶¶

37-49). The court will address the termination portion of his claim first.

      The plaintiff claims that he was not an active participant in the physical altercation that

resulted in his termination, but that he was attacked by Alexander. Under the circumstances, the

plaintiff must do more than "'merely question[ ] the wisdom of the [defendant's] reasons. . .

where . . . the reason is one that might motivate a reasonable employer.'" *Alexander v. Fulton

County, Ga.*, 207 F.3d 1303, 1339 (11th Cir. 2000), quoting *Combs*, 106 F.3d at 1543. He must

"cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct. . . .'" *Combs*, 106 F.3d at 1538. Therefore, even if Clark ultimately was the victim of a physical assault, he must show that the defendant was not merely mistaken in believing that he was an active participant in the altercation, but that it was at least in part motivated by race.

The first element of the prima facie case is met because the plaintiff is African-American. Likewise, the parties do not dispute the second element because he was terminated. Since he performed the job for several years, the court will assume that he was qualified to do the job. Therefore, the pertinent issue is whether white employees who were similarly situated were treated more favorably.

The plaintiff cites two instances where white employees engaged in an altercation, but were not terminated. The more recent incident involved Catalano and Brown. (Complaint ¶¶ 24-25). On June 9, 1995, Catalano and Brown were changing filters together when Catalano hit his head. (Doc. 25, Ex. 12). Catalano, who had a history of anger management problems, threw a filter in anger and it hit Brown. (*Id.*). Brown suffered a cut on his head as a result. (*Id.*). In a memorandum dated June 19, 1995, Brown states, "There was no intent on the part of Chris [Catalano] to hit me or anyone else, he was attempting to strike a valve not a person." (*Id.*). An unsigned "Employee Counseling Report or Warning" dated June 14, 1995, states that Catalano was terminated as a result of this misconduct (*id.* at UAB01579), but other documents demonstrate that he was not (*id.* at UAB01611). It appears that Catalano was suspended on June 20, 1995, for six days without pay and ordered to see a psychiatrist of UAB's choosing. (*Id.*). If Catalano failed to keep his appointment, his "employment with UAB [would] be immediately

20

terminated." (*Id.*).

The incident involving Catalano was different from the offense Clark was accused of committing. Clark was involved in a physical altercation, that is, a vehement dispute or quarrel involving physical injury. Catalano's situation is distinguishable because, although there was a physical injury, he was not involved in a physical altercation, which according to UAB's policy, would have resulted in his dismissal. While Catalano's inability to control his temper is troubling and resulted in injury, it is not the same as the situation involving Clark and Alexander. It is more akin to an accident than an altercation.

Courts "require that the quantity and quality of the comparator's misconduct must be nearly identical [to the plaintiff's] to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999) (citing *Dartmount Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989). Since Clark and Catalano were not involved in the same type of conduct, they are not similarly situated for purposes of comparison.

The earlier incident between David Templin and Scott McCain occurred on October 22, 1993. (Doc. 25, Ex. 11). Both McCain and Templin are white. (Odom Dep. at 46). In that incident, McCain admitted pushing Templin. (Aff. of William S. Odom, Jr., at ¶ 5). Jerry Hall, the supervisor wrote that Templin had accused McCain of punching and choking Templin. (Doc. 25, Ex. 11). McCain took responsibility for his actions, but UAB did not terminate him at that time. (*Id.*). He was warned that fighting could result in immediate discharge and was suspended for five days without pay. (*Id.*). Templin was also given three days off without pay as a result of the incident. (Doc. 25, Ex. 10). According to Odom, the incident between McCain and Templin was not an "all-out brawl." (Odom Dep. at 46). Neither of the individuals was physically

injured. (*Id.*).

The difference in injuries alone would be insufficient to rebut the plaintiff's assertion that these white co-workers were similarly situated to Clark. However, McWilliams was not in charge at that juncture and her zero tolerance policy was not in effect at that time. The Eleventh Circuit has stated that "[d]isciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis." *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11ᵗʰ Cir. 1989).

McWilliams became the Associate Vice President of Human Resource Management at UAB in November 1994. (Connie Pruett Aff. (hereinafter "Pruett Aff.") at ¶ 6).[28]  When McWilliams came to UAB, she changed the University's stance on workplace violence, adopting a zero tolerance policy. (Pruett Dep. at 11-13).  Implementation of this change was premised upon information and concerns about workplace violence.  The policy was made effective through informational presentations within the UAB system in an attempt to enforce the policy. (Pruett Aff. at ¶ 6).  The first presentation was made in 1996.  (*Id.*).  Accordingly, the circumstances do not support a conclusion that these incidents are appropriate for comparison. The policy change and the difference in decision makers precludes use of this incident for comparative purposes in this case.

In view of the foregoing, the court finds that the plaintiff has failed to establish his prima facie case.  Even if the plaintiff had established a *prima facie*, he has not adequately challenged the defendant's proffered reason for the termination – the zero tolerance policy.

The plaintiff further claims that not only was he subject to an adverse job action when he was terminated, but also that his working conditions were worse than those of his white

_____

[28] Affidavit of Connie Pruett can be found at doc. 17, exhibit L.

co-workers. (Complaint at ¶ 31). He claims disparate treatment premised on the fact that "[d]uring the course of his employment with the defendant, the plaintiff was treated differently than similarly situated white employees." (*Id.* at ¶ 26). The plaintiff goes on to state that he "was treated less favorably than white employees when the defendant attempted to transfer [him] because of the racial slur directed at him." (*Id.* at ¶ 30). Specifically, Baker told the plaintiff "[W]ho would you think would be moved out of the area first, you or Apperson?" (Clark Dep. at 132). Since the University did not move Clark, there was no adverse job action. Because an adverse job action is a required element to establish a prima facie case, this claim must fail.

The plaintiff also does not say when Baker reportedly made these comments. He merely states that he had problems with Apperson until 1998. (*Id.* at 131). If the comments were made even as late as the last day of December of that year, they would be time barred, since these claims arose more than six months prior to the filing of the plaintiff's EEOC charge. "A plaintiff may recover damages under Title VII only for known unlawful practices that occurred within 180 days of filing the complaint." *Lathem v. Dept. of Children and Youth Services,* 172 F.3d 786, 791 (11th Cir. 1999). "A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including date, place and circumstances of the alleged unlawful employment practice)." 42 U.S.C. § 2000e-5(e)(1). Thus, the plaintiff has failed to establish a prima facie of disparate treatment, because his claim is time barred.

Lastly, the plaintiff alleges that white employees were treated better with respect to the general terms of their employment. (Complaint at ¶¶ 37-48). By way of example, he states that "the defendant attempted to move the plaintiff to another department because of" the racial slur

23

incident involving Apperson.[29]   (*Id.* at ¶¶ 28-30, 90-93).  In Armstrong's deposition, he asserts

that the plaintiff was oftentimes assigned the worst buildings, the worst areas to work in, and the

worst equipment.  (Armstrong Dep. at 46).  Specifically, Armstrong stated that "it seem[ed] like

they [were] doing everything they could to make him [(Clark)] fail at his position or trying to

force him either looking bad or not being able to perform his job where they could get rid of

him."  (*Id.*).

Much of this testimony is undated or preceded the relevant period.  Additionally, because

there was no adverse job action associated with these matters, they fail to state a claim.  For

example, the fact that the defendant attempted to move the plaintiff is insufficient due to the fact

that he was never moved against his will.  To the contrary, his move to the dental department was

at his request.

In sum, the court finds that summary judgment is due to be granted on these claims.

### Retaliation

When the plaintiff does not have direct evidence of discrimination, a prima facie case of

retaliation can be established by demonstrating "(1) the plaintiff engaged in a statutorily

protected activity; (2) the employer took an adverse employment action against him; and (3) there

is a causal connection between the protected activity and the adverse action." *Berman v. Orkin

Exterminating Company*, 160 F.3d 697, 701 (11th Cir. 1999).  The causal connection requirement

"is satisfied if the evidence shows that the protected activity and the adverse action are not totally

unrelated." *Id.*  To establish the causal link, the plaintiff must at least show that the defendant

was actually aware of the protected expression when the adverse job action occurred. *Raney v.*

---

[29] The plaintiff refers to him as Appleson in his complaint.

24

*Vinson Guard Service, Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997). Additionally, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" *Clark County School District v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511, 149 L. Ed. 2d 509 (2001). In *Clark County*, the Supreme Court held that an action taken 20-months later does not suggest causality. *Id.*, 532 U.S. at 274. The cases that the Supreme Court cited in *Clark County* had held that actions that occurred over three or four months after the protected activity did not suggest causality. *Id.*, 532 U.S. at 273-74 (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992).

Additionally, where the plaintiff fails to produce direct evidence of retaliation, the employer may rebut the claim on a motion for summary judgment by "articulating legitimate reasons for the employment action." *Bigge v. Albertsons, Inc.*, 894 F.2d 1497, 1501 (11th Cir. 1990).

> In rebutting the plaintiff's prima facie case, a defendant employer must only produce credible evidence supporting its legitimate reasons. The employer does not bear the burden of persuasion. [ ] That burden remains with the plaintiff and is carried with evidence that the plaintiff's engagement in protected activity was a significant factor in the employer's decision.

*Bigge*, 894 F.2d at 1501-02 (footnote omitted).

Clark claims that he was terminated in retaliation for his activity in the *Perry Woods* litigation and for his involvement in UAB's internal grievance process. (Complaint at ¶ 67). The plaintiff fails to provide any direct evidence of a retaliatory intent. Clark was terminated effective August 17, 1999. (*Id.* at ¶ 62). Thus, temporal proximity alone could not establish causation because the last complaint that he was involved occurred sometime in 1998. (Clark

Dep. at 22). This is at least eight and one-half months prior to the termination. Additionally, UAB has established a legitimate, nondiscriminatory rationale for the plaintiff's termination – his involvement in the altercation and its zero-tolerance policy. Therefore, Clark has not carried his burden of persuasion on this claim.

### The § 1981 and § 1983 Disparate Treatment, Discrimination, and Retaliation Claims

The plaintiff also advances disparate treatment, discrimination, and retaliation claims in Counts IV through VI of the complaint pursuant to Title 42, United States Code, § 1981. However, the Eleventh Circuit has held "§ 1983 contains the sole cause of action against state actors for violations of § 1981." *Butts v. Volusia County*, 222 F.3d 891, 892 (11th Cir. 2000). The court has stated that valid § 1981 retaliation claims may be enforced by § 1983. *Webster v. Fulton County, Ga.*, 283 F.3d 1254, 1257 (11th Cir. 2002). Therefore, the § 1981 and § 1983 counts will be considered together.

State entities are immune from both § 1981 and § 1983 claims under the Eleventh Amendment. *Harden v. Adams*, 760 F.2d 1158, 1163 (11th Cir.), *cert. denied*, 474 U.S. 1007, 106 S. Ct. 530, 88 L. Ed. 2d 462 (1985); *Sessions v. Rusk State Hospital*, 648 F.2d 1066, 1068 (5th Cir. 1981). For the purposes of the Eleventh Amendment, state universities in Alabama are state entities. *Harden*, 760 F.2d at 1163. Therefore, the § 1981 and § 1983 claims are due to be dismissed.

### Due Process Claim

The plaintiff's last claim asserts that he was denied procedural due process in violation of § 1983 when he was not provided with a hearing to challenge his termination. (Complaint at ¶¶ 133-35). The defendant asserts that the "plaintiff has never pled a violation of due process under the Fourteenth Amendment in his complaint" and, even if he did, the defendant is entitled to

immunity under the Eleventh Amendment. (Doc. 27 at 7-8).

The defendant's first assertion, that such a claim was not pled, is incorrect. The complaint clearly includes a due process claim. (*See* Complaint at ¶¶ 133-35).

The defendant's second assertion, Eleventh Amendment immunity, is more on point. As noted above, the defendant is a state entity entitled to immunity from § 1983 actions.[30] *Harden*, 760 F.2d at 1163. Accordingly, this claim is due to be denied.

## CONCLUSION

Premised on the foregoing, the court finds that the defendant's motion for summary judgment (doc. 17) is due to be granted, the plaintiff's motion to strike Leonard's affidavit and the exhibits thereto (doc. 24) is due to be denied, and the defendant's motion to strike (doc. 26) is moot. An appropriate order will be entered.

**DONE**, this the ___8th___ day of May, 2003.

JOHN E. OTT
United States Magistrate Judge

---

[30] The plaintiff's reliance on *Cotton v. Jackson*, 216 F.3d 1328 (11th Cir. 2000), is misplaced. In *Cotton*, the question was not whether the defendant was entitled to Eleventh Amendment immunity, but whether the individual defendant was entitled to qualified immunity and whether there were adequate procedures available to the plaintiff to protect his rights. *Id.*, 216 F.3d at 1330-31.